IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID OSTRINSKY, as Administrator of the Estate of MICHAEL OSTRINSKY, deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15-CV-1545 |
| STANLEY BLACK & DECKER, INC., a Foreign Corporation, BLACK & DECKER (U.S.) INC., a Foreign Corporation, APPLICA CONSUMER PRODUCTS, INC., a Foreign Corporation, and SPECTRUM BRANDS, INC., a Foreign Corporation, | ) ) ) ) ) ) ) | Judge Samuel Der-Yeghiayan

Magistrate Judge Geraldine Soat Brown |
| Defendants. | ) ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO BAR
EXPERT TESTIMONY OF DARYL L. EBERSOLE, P.E., CFEI**

NOW COMES the Plaintiff, DAVID OSTRINSKY, as Administrator of the Estate of MICHAEL OSTRINSKY, deceased, by and through LAW OFFICES OF MATHYS & SCHNEID, and for his response to Defendant's Motion to Bar expert testimony from Daryl L. Ebersole, P.E., CFEI, states as follows:

**INTRODUCTION**

This wrongful death and Survival Action case involves a fire in Michael Ostrinsky's kitchen caused by a Black & Decker toaster that failed to pop up bagel slices and then heated them perpetually until they ignited a massive fire. Michael Ostrinsky died as a result of the smoke inhalation and carbon monoxide poisoning. Mitchell Kushner, the independent Fire Marshall who investigated the fire scene, testified that the toaster was energized, plugged in and operating at the time of the fire. He "found the toaster to be plugged into an electrical outlet. The plunger was in the down position and there was burned stuff inside the toaster. That is

1

where the fire V pattern traveled from." (Ex. 8, Mitchell Kushner Dep. 65:1-17). Mr. Kushner testified that the energized two-slice operating toaster caused the fire. (*Id.* at 90:6-9).[1]

One of the first questions jurors will have is: why did the toaster cause this fire? Daryl L. Ebersole is a Professional Engineer and Certified Fire and Explosion Investigator retained by Plaintiff to help answer that question. The flexible application of Rule 702 and *Daubert* allows for his opinions in this unique case. The issues raised in Defendant's "Daubert" motion go to the weight of Mr. Ebersole's opinions and would make for interesting cross-examination, but since those issues have nothing to do with Rule 702 or *Daubert*, his opinions ought to be admissible under these circumstances. This Court is granted wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Although required to perform its role as a gatekeeper, a district court's "[d]eterminations on admissibility should not supplant the adversarial process; "shaky expert testimony may be admissible, assailable by its opponents through cross examination. *Id.*

### MR. EBERSOLE'S OPINIONS

Mr. Ebersole's curriculum vitae and his Engineer's Report were attached as Exhibits 5 and 7 to Defendant's motion, but the motion failed to cite all of Mr. Ebersole's opinions. After reviewing all case materials, conducting multiple inspections of the subject toaster, reviewing design standards, fire investigation standards, and conducting simulation testing on a substantially similar toaster, Mr. Ebersole authored a 77-page engeineering report that concluded with ten primary opinions, as follows:

1.    The evidence shows that the Black & Decker toaster failed to pop up and this caused the ignition of food products.

---

[1] Exhibit 8 is the only exhibit Plaintiff adds to the briefs. Citations herein to other exhibits (i.e., 3, 4, 5, 6, and 7) refer to the exhibit numbers used by Defendant in its opening brief.

2. The ignition of the food by the Black & Decker toaster resulted in the spread of fire and caused the death of Mr. Ostrinsky.

3. Black & Decker's failure to provide hardware that would have de-energized the heating elements independently of the carriage position was a cause of the fire and Mr. Ostrinsky's death.

4. Black & Decker's failure to provide a thermal cutoff for reacting to climbing temperatures within the toaster was a cause of the fire and Mr. Ostrinsky's death.

5. The Black & Decker toaster was defectively designed and this was a cause of Mr. Ostrinsky's death.

6. Black & Decker failed to follow a reasonable standard of care in the design of the toaster and this was a cause of Mr. Ostrinsky's death.

7. The Black & Decker toaster was unreasonably dangerous and was unfit for its intended purpose.

8. It was unreasonable for Black & Decker to design a toaster that would indefinitely heat food products to the point of combustion as a result of foreseeable failures and blockages within the toaster.

9. Providing a design that would have prevented the fire would not have imposed a significant cost to the manufacturer and would not have defeated the utility of the toaster.

10. The Owner's Manual failed to adequately warn the user that the toaster could fail to pop up due to problems including jammed food products, that the food products would continue to be heated indefinitely, that the food products would likely be ignited, and that under no circumstances should the toaster be used without remaining in close proximity for the purpose of manually terminating the cycle by unplugging the toaster when necessary.

(Ex. 6, Ebersole Engineering Report 77).

## ARGUMENT

Mr. Ebersole's opinions pertain to "scientific knowledge" and were derived by the scientific method, they will certainly assist the trier of fact in understanding the evidence and in determining a fact at issue (did the negligent design of the toaster cause the fatal fire?). *Traharne v. Wayne/Scott Fetzer Co.,* 156 F. Supp.2d 697 (N.D. Ill. 2001). The rules of evidence embody a strong preference for admitting any evidence which has the potential for assisting the trier of fact. (*Id.* at 702). Rule

702 of the Federal Rules of Evidence governs the admissibility of expert testimony and it too has a liberal policy of admissibility. (*Id.* at 702). The Rule's liberal policy of admissibility is predicated on "trust in the power of cross-examination to discern the truth, and a fundamental belief in the role the jury plays as the finder of fact in our system of justice." (*Id.* at 702).

I.     **Daryl Ebersole, P.E., CFEI, is Qualified to Give Opinions Concerning Toaster Design, The Toaster Malfunction and Cause of the Fire in This Case.**

"A court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).

Mr. Ebersole is a licensed Professional Engineer and Certified Fire and Explosion Investigator. (Ex. 5, Ebersole CV at 4). He is an electrical engineer. (*Id.).* He holds a Bachelor's of Science in Electrical Engineering from Drexel University in 1997. (*Id.*). He is a member of the National Association of Fire Investigators, National Fire Protection Association (NFPA), National Society of Professional Engineers, Institute of Electrical and Electronics Engineers and two Underwriters Laboratories (UL) Standards technical panels. (*Id.* at 7). He has presented on the topic of Fire/Explosion Origin and Cause Investigation in 2006. (*Id.*). He was an instructor at the Lancaster County Career and Technology Center for three years training students in electrical engineering for the electrical industry regarding safety, industrial, commercial and residential. (*Id.* at 3). He worked as an electrical engineer specifically including aspects of electrical engineering designs. (*Id.).* He was a firefighter from 1984-1986. (Ex. 6, Ebersole Dep. 44:4-8). Mr. Ebersole investigated more than 400-500 fires as a primary fire investigator. (*Id.* at 48:5-15). Mr. Ebersole is familiar with, and incorporated in his opinions, the methodology for fire investigation contained in National Fire Protection Association (NFPA) 921 (2011)- Guide for Fire and Explosion Investigations. (*Id.* at 46:17-21, 51:1-3, 56: 6-9) and

4

(Ex. 6, Ebersole Engineering Report 70-71). Mr. Ebersole is familiar with, and incorporated in his opinions, the Underwriters Laboratories (UL) 1026 3rd and 4th Edition Standards for Safety-Electric Household Cooking and Food Serving Appliances standards as well as the National Standards of Canada (CSA). (*Id.* at 74-76). Mr. Ebersole has prior experience testing the identical failure method as here in other Black & Decker Toasters, the T2400 and T4600.

Defendant's flawed argument that Mr. Ebersole is not qualified (because he has no specific experience actually designing toasters or knowledge concerning the "state of toaster design" in 1994) is simply not supported by the case law in the 7th Circuit. "***The notion that Daubert … requires particular credentials for an expert witness is radically unsound***…anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp*., 223 F.3d 585, 591 (7th Cir.2000)(emphasis added). "Ordinarily, courts impose ***no requirement that an expert be a specialist*** in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir.2010)(emphasis added). Mr. Ebersole is not required to be a "toaster specialist."

Any inquiry into the propriety of Mr. Ebersole giving expert opinions must necessarily begin with Rule 702 of the Federal Rules of Evidence, which provides: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Generally, where a proffered expert has expertise in a broad subject, he may give expert testimony on any specialized topic within that subject area. *Baumholser v. Amex Coal Co.*, 630 F.2d 550, 551 (7th Cir.1980) (geologist was permitted to testify that blast from coal mine

operations was proximate cause of damage to plaintiff's home even though he had little actual experience with coal mining; opinion was based on general geologic principles). Along the same lines, *in personal injury cases, courts usually permit witnesses with general engineering or science backgrounds to testify as to the safety of a product, even where the witness has no specific experience with the product or industry in question*. *DaSilva v. Am. Brands, Inc.*, 845 F.2d 356, 361 (1st Cir.1988) (trial court did not abuse its discretion in permitting mechanical engineer to opine as to safety of design of machine even though witness had no experience with machine)(emphasis added). Gaps in an expert witness's qualifications or knowledge will generally go to the weight of the testimony, not its admissibility. *Spray–Rite Serv. Corp. v. Monsanto Co*., 684 F.2d 1226, 1241 (7th Cir.1982) (in civil antitrust action, plaintiff's expert was qualified to testify since he was an expert in marketing, even though he was not an expert in all fields relating to marketing analysis); *Daubert v. Merrill Dow Pharm*., 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

It is only in rare cases, where the relevant area of specialization is simply not amendable to a generalist's analysis, that courts will exclude the testimony all together. *United States v. Prouse*, 945 F.2d 1017, 1026 (8th Cir.1991) (chemist not permitted to testify about specific effects of alcohol on information processing skills); *Fireman's Finds Ins. Co. v. Videfreeze Corp*., 540 F.2d 1171, 1180 (3d Cir.1976) (geologist permitted to testify about rock formation and slippage, but not permitted to testify as to whether earthquake caused landslide, as he lacked experience in seismology).

In *Gayton v. McCoy,* 593 F.3d 610, 616-617 (7th Cir. 2010), the Court held that a general practice physician could testify concerning plaintiff's cause of death even though he was neither a cardiologist nor pharmacologist, had no specific expertise on heart disease, and did possess any training regarding certain drug interactions relevant in the case.

In *Hasan v. Cottrell, Inc.,* 2014 WL 4124254 (N.D. Ill. 2014), the Court held that a witness' "expertise as a mechanical and aerospace engineer is not in dispute, and nothing in the record suggests that in the present context, "fall protection design" or the "ergonomics associated with such fall protection" require such a highly specialized analysis that an engineer of [the expert's] training and background is not qualified to answer the questions he may be asked on those issues."

Here, Mr. Ebersole is clearly an expert Professional Engineer, and Electrical Engineer, and a Certified Fire and Explosion Investigator who investigated over 400-500 fires. He consulted on two prior cases where Black & Decker toasters were alleged to have caused a fire. His opinions cover matters concerning scientific, technical or specialized knowledge, and his testimony would certainly assist the trier of fact. His opinions are based on electrical engineering and fire investigation scientific principles that were the same scientific principles used by Defendant's expert witnesses. ***The requirement that an expert be qualified by knowledge, skill, experience, education, or training should not be viewed as being particularly rigorous. Traharne,*** 156 F. Supp.2d at 706 (emphasis added). A witness may qualify as an expert even if the opposing party can point to deficiencies in his or her qualifications. *Id.* Once a witness passes the threshold of knowledge, skill, experience, training, or education to qualify as an expert, any shortcomings or deficiencies which he or she possesses are reserved for cross-examination. *Id.* Mr. Ebersole certainly has passed this initial Rule 702 threshold and

Defendant's motion to bar should be denied. *See Traharne* 156 F. Supp.2d at 706 (an electrical engineer expert was qualified to give opinions concerning electrical shock injuries).

## II. <u>Daryl Ebersole's Opinions are Scientifically Reliable</u>

When this Court assesses the reliability of Mr. Ebersole's opinions concerning alternative design, it is important to remember two facts: 1) Mr. Ebersole uses the same scientific method as the Defendant's expert, David Sitter, and; 2) Mr. Ebersole's alternative designs were in fact the required standard in Canada from 1993 and in the United States evolving into 2001. Based on that alone, his opinions concerning alternative design must certainly be reliable. Similarly, Mr. Ebersole's theory on the cause of the fire was based on several inspections of the toaster (include microscopic inspections), his training and experience, and his repeated testing of his theory on several other Black & Decker toasters (including a very substantially similar exemplar toaster). This is the same information and methodology relied on by Defendant. Mr. Ebersole's report clearly shows that he did not "essentially [work] backwards from the fact of a fire to attempt to identify an alleged negligent design in the toaster at issue." (Defendant's Brief, 11). Rather, he relied on the testimony of the Fire Marshall regarding cause and origin of the fire (the energized toaster) and examined all aspects of the physical toaster evidence and its design to determine how the fire started within the toaster. He conducted essentially the same tests on toasters as Defendant's expert to determine whether a bagel would ignite if the heating elements failed to turn off due to a carriage/food jam. Mr. Ebersole's testing on the exemplar toaster proved his theory that the fire in the toaster at issue was caused by the design of heating elements being dependent on the movement of the carriage, so that if the bagel was jammed the heating elements would continue to heat the food so that it ignited.

It is clear from Defendant's motion that it simply does not agree with Mr. Ebersole's opinions and thinks its experts' opinions are better. Expert testimony "should be admitted so long as it can be adequately tested by the adversary. It is not up to the judge, even after *Daubert*, to scrutinize expert testimony so strictly that only the perfect expert will be permitted to testify." *Traharne* 156 F. Supp.2d at 712. "Whether an expert might have done a better job is not the test for the admissibility of his testimony." (*Id.*). Accordingly, whether Mr. Ebersole's methodology was the most reliable or the best, is best left to the trier of fact to decide. Where, as here, an expert is highly qualified, "a trial court should be especially reluctant to exclude a disputed methodology....". (*Id.*)

In reality, the methodology between the experts is not disputed at all. Mr. Ebersole and Defendant's expert, David Sitter, share the exact same scientific methodology, tested and inspected the subject toaster several times together, reviewed the exact same UL standards, followed the exact same fire investigation techniques found in NFPA 921, and they conducted the same type of simulation tests on other toasters. (Ex. 4, Sitter Report 9-10) (*See also Defendant's Brief*, Footnote 4, pg. 13.) That the experts (*Ebersole v. Sitter*) arrive at different conclusions (or the fact that Sitter's toaster test didn't produce the large flame that Mr. Ebersole's tests did) does not suddenly make Mr. Ebersole's opinions "unreliable".

As "gatekeeper," this Court must determine whether Plaintiff has established that the proposed expert testimony is "based on sufficient facts or data," whether it is "the product of reliable principles and methods," and whether those principles and methods have been "reliably applied ... to the facts of the case." Fed.R.Evid. 702. The Court must decide "whether he consulted reliable sources and provided reasoned explanations connecting the source material to his conclusions." *Lees v. Carthage College*, 714 F.3d 516, 524 n. 3 (7th Cir.2013). District

9

courts have "latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Gayton*, 593 F.3d at 616. Moreover, the test for reliability is "flexible":

> A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the Daubert threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."

*Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir.2012) (quoting Daubert, 509 U.S. at 596). It is not the trial court's role to decide whether an expert's opinion is correct. *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000).

Mr. Ebersole's negligent design opinions center on two issues: *1)* the toaster should have been designed so that the heating elements shut off independent of the toaster carriage movement; so even if the toaster carriage gets jammed or stuck in the down position, the heating elements will shut off appropriately instead of heating the bagel until the end of time, or whenever the bagel catches on fire, whichever happens first, and; *2)* the toaster design should have included a thermal cut-off sensor to cut the power to the heating elements if the toaster became too hot. Mr. Ebersole opines that either of these design features would have prevented the incident that killed the Plaintiff.

Mr. Ebersole's first opinion (the design needed heating elements independent of the carriage movement) is not some random, unscientific opinion: it is based on his education, training, experience, testing, and supported by the National Standard of Canada from 1993 and the Underwriters Laboratory Standard 1026 4th Edition from 1998. The National Standard of Canada (CSA)- CSA-E335-19-Abnormal Operation- 19.101, states:

> Toasters loaded with the bread specified for normal operation are operated at rated power input. The ejector mechanism is prevented from releasing and the supply is maintained to the heating elements after the time has completed its cycle. The test is terminated after any fire has extinguished after which any residual bread is removed from the toaster."

(Ex. 6, Ebersole Engineering Report 70-71). Mr. Ebersole testified that the CSA standard date of 1993 shows that standard was being developed by people, including manufacturers of appliances, like toasters, and it was well known in the industry that it was a reasonable test to actually put a load of bread into a toaster and [disable the ejector mechanism to see what happened if the heating elements stayed on]. (Ex. 6, Ebersole Dep. 164:5-19).

Further, the Underwriters Laboratory Standard 1026 4th edition that was released in 2001 required the exact design feature that Mr. Ebersole opines was required: ***the toaster shall be energized independent of the movement of the carriage***. (Ex. 3, Sitter Dep. 63-64) *See also* (Ex. 4, Sitter Report 8). Though Plaintiff concedes that the 4th edition standard did not yet technically apply to the toaster at issue, this standard is conclusive proof that Mr. Ebersole's opinion is scientifically sound and reliable, since his design opinion is identical to what became the actual standard for all toasters according to Underwriters Laboratory. Mr. Ebersole's opinions include the notion that manufacturers were aware of his proposed alternative design in the years leading up to the release of UL 1026 4th edition, especially since it was required in Canada in 1994. The Canadian and UL standards were evolving standards that developed over time.

As to the second opinion (a thermal cut-off sensor was required), this design feature was already incorporated into various Black & Decker products during the time period at issue. (Ex. 4, Sitter Report). Thus, it is not credible to argue that Mr. Ebersole's alternative design opinion concerning the thermal cut-off is scientifically "unreliable."

Among the general, non-dispositive, non-exclusive, flexible factors that courts generally weigh and consider in determining whether or not a proffered expert's testimony is predicated on valid reasoning, that is, reliable methodology or technique are "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, which analysis we do not find applicable here; and (4) whether the theory has been generally accepted." *Daubert*, 509 U.S. at 593, 594.

Here, both experts tested the theory, using the exact same technique with only slightly different variables, that the toaster at issue would heat a jammed bagel indefinitely until it started a fire. The experts came to different conclusions, but the theory was tested multiple times. Second, Mr. Ebersole's alternative design theory was subjected to peer review and publication back in 1993 and 2001 when it became the manufacturing standard for toasters in Canada and the United States, respectively. Third, the known of potential rate of error with Mr. Ebersole's theory is not an issue here. Finally, Mr. Ebersole's alternative design theory is obviously generally accepted because it is what the standard evolved into for manufacturers between 1993-2001.

Defendant insists that Mr. Ebersole's alternative design opinions are unreliable because he did not test the designs he identified. However, this is "precisely the type of shortcomings that can be explored on cross-examination." *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586–87 ("the factual underpinnings of expert testimony may be subject to counter-attack"); *see also Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929–30 (8th Cir.2001) (the "factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination").

12

### III.    Daryl Ebersole Is Not Required to Test His Alternative Designs

Defendant's wrongfully argue that Mr. Ebersole should be barred because his "alternative designs are untested."  The two problems with that argument are:  1) Mr. Ebersole's alternative design actually became the requirement for all manufacturers in the Canadian and UL 1026 4th edition standard, so why would he have to build a toaster and test it now? and; 2) the case law does not require Mr. Ebersole to build a toaster and test his alternative design.

Since Mr. Ebersole's alternative designs became the standard in Canada in 1994 and the U.S. in 2001, or were already in use by Black & Decker in 1994, it would be patently unfair to require Mr. Ebersole to build a toaster and test these designs before he testifies under these circumstances.  Testing is an acknowledged part of the design process. *Traharne,* 156 F. Supp.2d at 712.  However:

> the *Daubert* gatekeeping function of trial courts was ***not meant to force*** product liability plaintiffs to obtain as ***experts inventors or designers*** of new and improved products ***in order to succeed in products liability litigation***. Product design is achieved over many years of research and testing by corporate Research and Development Departments and only after the expenditure of huge sums of money and manpower. Such testing expenditures would be cost prohibitive for the vast majority of plaintiffs. ***To require physical testing of an expert's opinions before the expert is permitted to testify would mean the elimination of product liability suits by ordinary non-corporate citizens. No ordinary citizen could afford such prohibitive up front litigation costs***.

*Traharne*, 156 F. Supp.2d at 712-713 (emphasis added).  In *Traharne*, the expert electrical engineer had opinions concerning the design of a defective sump pump, but the expert did not actually build a sump pump or test the design he proposed.  The Court allowed the expert to testify without having to build the sump pump or test the design, holding that "the expert can specifically point to wherein the defendant's design is defective ***and*** wherein a proposed modification is be [sic] most helpful to the jury. The fact that he has not performed any testing or

13

engineering analysis relating to his suggested modifications will go to the weight to be given his opinions in this regard." *Id.* at 713 (emphasis in original).

Mr. Ebersole states that his opinions are predicated on generally accepted engineering principles and his expertise. He can show the jury exactly how the toaster's design was defective, how the toaster started the fire, and how the proposed alternative designed would have prevented the fatal fire. These opinions would be most helpful to the jury. Whether or not he built his own toaster from the ground up to test his alterative design in formulating his opinions should merely be an issue left for the trier of fact to weigh. *Traharne,* 156 F. Supp.2d at 713.

## IV. Daryl Ebersole Opinions Regarding Inadequate Warnings is Admissible

Mr. Ebersole's 10th opinion in his report states exactly how the toaster warning is inadequate and what the proper warning should indicate in the Owner's Manual:

> The Owner's Manual failed to adequately warn the user that that the toaster could fail to pop up due to problems including jammed food products, that the food products would continue to be heated indefinitely, that the food products would likely be ignited, and that under no circumstances should the toaster be used without remaining in close proximity for the purpose of manually terminating the cycle by unplugging the toaster when necessary.

(Ex. 7, Ebersole Report 77). There is no need to draft a proposed warning: this is the proposed warning language in substance. Defendant's reliance on *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 538 (7th Cir. 2000) is misplaced because the expert there never even drafted proposed warning language. Here, the proposed language for the Owner's Manual, in substance, is actually contained in Mr. Ebersole's Engineering Report. Defendant had the opportunity to cross examine Mr. Ebersole concerning the language in his discovery deposition but chose to not do so. Thus, the proposed warning language should be admissible.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion to Bar expert testimony of Daryl Ebersole, and grant any other relief this Court deems just.

Respectfully submitted,

LAW OFFICES OF MATHYS & SCHNEID
Attorneys for the Plaintiff

By:     /s/ Mark T. Schneid

Mark T. Schneid
LAW OFFICES OF MATHYS & SCHNEID
1730 Park Street, Suite 209
Naperville, Illinois 60563
Telephone: (630) 428-4040
Facsimile: (630) 428-0044
Email: mts@mathyslaw.com

15